**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JUDITH KAYE NADLER, Individually and On Behalf of Herself and All Others Similarly Situated,<br><br>　　　　　Plaintiff,<br>　　v.<br><br>CHARMING SHOPPES, INC., MICHAEL GOLDSTEIN, KATHERINE M. HUDSON, BRUCE J. KLATSKY, ALAN ROSSKAMM, RICHARD W. BENNET III, ANTHONY M. ROMANO, PAULA A. PRICE, ARNAUD AJDLER, MICHAEL C. APPEL, and MICHAEL J. BLITZER,<br><br>　　　　　Defendants. | Civil Action No. _____<br><br>**INDIVIDUAL AND CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## INDIVIDUAL AND CLASS ACTION COMPLAINT

Plaintiff Judith Kaye Nadler ("Plaintiff"), by her attorneys, alleges upon information and belief, except for those allegations that pertain to plaintiff, which are alleged upon personal knowledge, as follows:

### NATURE OF THE ACTION

1. This is an action brought by Plaintiff, a holder of the common stock of Charming Shoppes, Inc. ("Charming Shoppes" or the "Company"), as to herself only, against the Company and the members of the Company's board of directors (the "Board" or the "Individual Defendants") arising out of their violations of §14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(e) (the "1934 Act"), in connection with the dissemination of a false and materially misleading Schedule 14d-9 solicitation/recommendation statement in connection with the proposed sale of Charming Shoppes to Ascena Retail Group, Inc. ("Ascena") via a tender offer (the "Proposed Transaction").

1

2.     This action also asserts a class action claim on behalf of Plaintiff and the other public shareholders of Charming Shoppes seeking to enjoin the Proposed Transaction for fundamental unfairness under 15 Pa. C.S. §1105. The action alleges that the Individual Defendants caused the Company to enter into the Merger Agreement on terms which disproportionately benefit the Individual Defendants and to the detriment of Plaintiff and Charming Shoppes's other public shareholders.  In this regard, as alleged in detail below, Plaintiff alleges that the Company's directors were motivated, in significant part, to agree to sell the Company because of the extensive cash payments they are receiving in connection with the Proposed Transaction, which payments they would not otherwise receive at this time absent the sale of the Company. This action seeks to enjoin the Proposed Transaction until such time as Defendants make additional, material disclosures regarding the Proposed Transaction, as described in more detail below.

3.     Under the terms of the agreement and plan of merger dated May 1, 2012 ("the "Merger Agreement"), Ascena, through its wholly owned subsidiary Colombia Acquisition Corp. ("Merger Sub"), commenced an all-cash tender offer for all outstanding shares of common stock of the Company at a purchase price of $7.35 per share (the "Tender Offer").  The Tender Offer is scheduled to expire at midnight, Eastern Standard Time, on June 12, 2012, unless extended. The Proposed Transaction is valued at approximately $890 million.

4.     The Individual Defendants failed to fulfill their most basic obligation to conduct a full and fair sale process to ensure that Charming Shoppes's stockholders receive the highest reasonably available value for their shares of Charming Shoppes stock and agreed to grossly unfair terms in connection with the Proposed Transaction.

2

5.      The Proposed Transaction is the result of the Board's needless decision to abruptly conclude its sale process and enter into the Merger Agreement with Ascena. After failing in a fruitless attempt to divest its Fashion Bug and Figi's lines of business in 2011, the Board abruptly shifted course by hiring a new investment banker, Barclays Capital Inc. ("Barclays"), to advise the Company on its strategic alternatives. In order to secure a deal as quickly as possible, the Board opted to eschew potentially value-maximizing alternatives in favor of pursuing negotiations with its preferred bidder, Ascena. As a consequence, Board has abdicated its responsibilities to the Company and to Charming Shoppes shareholders by not engaging a detailed and fulsome process and by omitting material information from the Schedule 14d-9 solicitation/recommendation statement that the Company filed with the Securities and Exchange Commission on May 15, 2012 (the "Recommendation Statement").

6.      As detailed below, the Board subjected the Company to a slew of deal protections, including a $30 million termination fee, a favorable top-up option, and a no-solicitation clause.

7.      In addition, Defendant Anthony M. Romano ("Romano"), Charming Shoppes's Chief Executive Officer, President, and a Director, had significant personal interests that he advanced at the expense of Charming Shoppes's public shareholders. For example, defendant Romano stands to gain a portion of the $6 million success and retention bonus plan payments, entered into a generous severance agreement in conjunction with the Proposed Transaction, and is expected to maintain his coveted position at the Company following the close of the Proposed Transaction. In short, defendant Romano appears to have pursued his own interests instead of pursuing a process designed to maximize value for the Company's public shareholders.

3

8.      Furthermore, the Proposed Transaction does not offer a meaningful premium to Charming Shoppes's public shareholders, as the consummation of the Proposed Transaction will divest them of an interest in Charming Shoppes and, consequently, deprive them of the opportunity to share in the Company's profits as its prospects materialize or demand a premium for a sale of control in the future.

9.      The price contemplated by the Proposed Transaction represents a meager premium of 25% to the closing market price of Charming Shoppes common stock on May 1, 2012, the day before the Company announced the Proposed Transaction.

10.     Finally, the Recommendation Statement fails to disclose material information necessary for Charming Shoppe's shareholders to decide whether to support the Proposed Transaction and tender their shares to Merger Sub.  The Recommendation Statement fails to make material disclosures regarding the defective sales process, the interests of members of the Board, key financial data and assumptions relied upon by Barclays in rendering its fairness opinion and strategic alternatives available to the Board.  The Board has left Charming Shoppe's public shareholders without material information necessary to make the most significant decision they will ever have to make as owners of the Company: whether to tender their shares and cash-out their interests in the Company.

11.     Accordingly, Plaintiff seeks to enjoin the Proposed Transaction or to rescind the Proposed Transaction in the event of its consummation.

### PARTIES

12.     Plaintiff is a stockholder of Charming Shoppes and has held shares of Charming Shoppes at all relevant times.

13.     Defendant Charming Shoppes is a corporation organized and existing under the laws of the State of Pennsylvania. It maintains its principal corporate offices at 3750 State Road,

4

Bensalem, Pennsylvania 19020, and is a specialty apparel retailer with a leading market share in women's plus-size specialty apparel. The Company's business operations consist primarily of its three core brands: Lane Bryant, Fashion Bug, and Catherines Plus Sizes. These core brands operate retail stores and store-related ecommerce websites under the Company's retail stores segment. In addition to the retail stores segment, the Company also derives revenues from sales of food and gifts through its Figi's catalog and website, which operates under the Company's direct-to-consumer segment. Shares of Charming Shoppes stock trade on the NASDAQ exchange under the symbol "CHRS."

14.     Defendant Michael Goldstein ("Goldstein") has been a director of the Company since 2008, and has served as the Chairman of the Board since 2010.

15.     Defendant Katherine M. Hudson ("Hudson") has been a director of the Company since 2000.

16.     Defendant Bruce J. Klatsky ("Klatsky") has been a director of the Company since 2010.

17.     Defendant Alan Rosskamm ("Rosskamm") has been a director of the Company since 1992.

18.     Defendant Richard W. Bennett III ("Bennett") has been a director of the Company since 2008.

19.     Defendant Romano has been a director, President, and CEO of the Company since 2011.

20.     Defendant Paula A. Price ("Price") has been a director of the Company since 2011.

21.     Defendant Arnaud Ajdler ("Ajdler") has been a director of the Company since 2008.

22.     Defendant Michael C. Appel ("Appel") has been a director of the Company since 2008.

23.     Defendant Michael J. Blitzer ("Blitzer") has been a director of the Company since 2010.

24.     Defendants Goldstein, Hudson, Klatsky, Rosskamm, Bennett, Romano, Price, Ajdler, Appel, and Blitzer are collectively referred to as Individual Defendants. The Individual Defendants as officers and/or directors of Charming Shoppes, have a fiduciary relationship and responsibility to Charming Shoppes.

## JURISDICTION AND VENUE

25.     This court has jurisdiction pursuant to §27 of the 1934 Act for violations of §14(e). This Court also has supplemental jurisdiction over Plaintiff's other Pennsylvania law class claims pursuant to 28 U.S.C. § 1367 as the other claims are related.

26.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because the transactions which gave rise to this action occurred in substantial part in this district, because a substantial part of the events or omissions giving rise to the claim occurred in this district, and because Charming Shoppes has its principle place of business in this District. Plaintiff's claims arose in this district, where most of the documents are electronically stored and where the evidence exists, and where virtually all the witnesses are located and available to testify at the jury trial permitted on these claims in this Court.

## DEFENDANTS' DUTIES PURSUANT TO THE 1934 ACT

27.     Under Section 14(e) of the 1934 Act, Defendants have an obligation to refrain from making any untrue statement of a material fact or omitting to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any deceptive or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

28.     As alleged in detail *infra*, the Individual Defendants have violated their obligations under the 1934 Act in that on or about May 15, 2012, they caused the Company to file the Recommendation Statement with the SEC and mailed the same to Plaintiff, but concealed therein certain material information which Plaintiff and other reasonable shareholders would find material in determining whether to tender their shares. Among other things, the Individual Defendants have failed to disclose material information regarding: (i) the merits of certain strategic alternatives, (ii) the purported sale process that the Individual Defendants engaged in prior to entering into the Merger Agreement, and (iii) details of the analyses underlying the opinion prepared by Barclays, that the price to be paid pursuant to the Merger Agreement is fair (the "Fairness Opinion") – all information which courts have repeatedly held ought to be disclosed to shareholders. Charming Shoppes similarly violated its obligations under the 1934 Act by filing and mailing the Recommendation Statement omitting the material information described above.

## CLASS REPRESENTATION ALLEGATIONS

29.     With respect to Plaintiff's Pennsylvania law claims only, Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all Charming

Shoppes public common stockholders, except the Defendants herein and any person(s), firm(s), trust(s), corporation(s), or other entit(ies) related to or affiliated with them, who are or will be threatened with injury arising from Defendants' actions, as more fully described herein (the "Class").

30.     This action is properly maintainable as a class action.

31.     As of May 11, 2012, Charming Shoppes had approximately 116.8 million shares of common stock outstanding.

32.     There are questions of law and fact which are common to the Class including, *inter alia*, whether the Proposed Transaction is fundamentally unfair to Plaintiff and the other members of the Class.

33.     Plaintiff's claims are typical of the claims of the other members of the Class in that it and all members of the Class have suffered and will suffer the same damage from the defendants' actions.

34.     Plaintiff will fairly and adequately protect the interests of each member of the Class. Plaintiff is a public shareholder of Charming Shoppes who is committed to the vigorous prosecution of this action and has retained counsel competent and experienced in this type of litigation.

35.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

8

36.     Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is appropriate.

## SUBSTANTIVE ALLEGATIONS

### The Company Has Rebounded and Is Poised For Significant Growth

37.     Charming Shoppes is poised for substantial growth. On March 27, 2012, the Company announced its results for its fourth quarter of 2011 and fiscal year ended January 28, 2012. The results confirmed that the Company is continuing to improve its profitability and has emerged from the economic downturn in solid fiscal shape.  Notably, the Company posted its fifth consecutive quarter of improved year over year results and generated an operating income for the first time in four years.  The Company reported, on a non-GAAP basis, an increase of adjusted income from operations of $42.9 million or 210 basis points as a percent of sales to $24.7 million for fiscal year 2011, compared to an adjusted loss from operations of $18.2 million for the prior year. In addition, the Company reported an Adjusted EBITDA increase of $2.0 million, or 19%, to $12.7 million for the fourth quarter.

38.     The Company also announced that it would be continuing to pursue a strategy of opening more of its most profitable stores, while it would be closing less profitable locations.  To that end, the Company announced plans to open approximately 125 new locations and 125 relocations from malls into new locations with stronger operating metrics over the next few years.  Charming Shoppes also announced plans to close between 90 and 105 underperforming stores, consisting of mostly Fashion Bug and Catherines Plus Sizes stores.

39.     Defendant Romero, the Company's Chief Executive Officer, commented on the Company's record performance and the bright future that lay ahead:

"I am very pleased with our results for the 2011 fiscal year. In the face of rising product costs, restrained consumer spending and an intensely promotional holiday environment, we delivered an Adjusted EBITDA increase of 62% to $81.4 million, generated operating income for the first time in four years, increased our gross margin by 90 basis points, leveraged our SG&A and Occupancy and Buying expenses by a combined 70 basis points as a percent of sales and generated cash of $51.1 million"

40.     The Company's strong recent performance likewise translated into significant gains in its stock prices over the past few months. Charming Shoppes stock, which was trading at $2.42 per share as recently as October 3, 2011, more than doubled in value to close at $5.90 per share on May 1, 2012, the day before the Proposed Transaction was announced.

**The Inadequate Process Preceding The Proposed Transaction**

41.     In the Recommendation Statement, Charming Shoppes disclosed information relating to the strategic process that preceded the execution of the Merger Agreement. Following the failed attempt to divest certain Charming Shoppes assets in 2011, the Company conducted an equally inadequate sales process to sell the entire Company in late-2011 and 2012. The Individual Defendants have compounded this harm by filing a materially misleading and deficient Recommendation Statement.

**The Board Fails in Its Attempt to Divest Its Fashion Bug and Figi's Businesses**

42.     In March 2011, Charming Shoppes retained an investment bank to assist with the divestment of its Fashion Bug and Figi's businesses. The Company, with the assistance of this financial advisor, conducted a sales process as to each business segment.

43.     By September 2011, the Board had lost patience with the ineffectual efforts of its financial advisor to secure a divestment of either the Fashion Bug or Figi's businesses. Specifically, management reported to the Board that the sales process failed to generate any

acceptable offers for either business segment and, in the case of Fashion Bug, would have required an ongoing relationship with the divested business over a period of time.

44.     Accordingly, the Company resolved that it would retain a new financial advisor to explore new alternatives available for the Company, including a potential sale of Charming Shoppes as a whole. Thereafter the Board retained Barclays Capital Inc. ("Barclays") to evaluate both potential sales of the Company as a whole as well as the sale of only the Fashion Bug business.

**Barclays Takes Over the Strategic Process**

45.     On November 8, 2011, the very same day that Barclays gave its first presentation to the Board, defendant Romano, the President and Chief Executive Officer of Charming Shoppes, met with David Jaffe ("Jaffe"), President and Chief Executive Officer of Ascena. Jaffe expressed an interest in potentially acquiring the Company as a whole.

46.     On December 1, 2011, Charming Shoppes issued a press release announcing that it was undertaking a strategic and financial review of Charming Shoppes's operations and that it had determined to divest the Fashion Bug business.

47.     On December 19, 2011, Charming entered into the Confidentiality Agreement with Ascena and subsequently provided Ascena with confidential information. Romano met with Jaffe two days later to discuss a potential sale to Ascena.

48.     On January 18, 2012, at a meeting of the Board, representatives of Barclays informed the Board that a bidder identified as "Party B" submitted a proposed offer for the Fashion Bug assets and had reported that it was prepared to close a transaction within 30 days and anticipated furnishing its due diligence requests to management shortly.

49.     During the months of February and March 2012, Barclays contacted 40 other potential bidders for Charming Shoppes as a whole, consisting of 24 financial bidders and 16 strategic bidders. Between February 7, 2012 and March 14, 2012, the Company entered into confidentiality agreements with respect to a sale of the Company with 21 of them, including four parties referred to as "Party D," "Party E," "Party F" and "Party G."

**The Company Receives Bids**

50.     On March 9, 2012, at a meeting of the Board, representatives of Barclays informed the Board that Ascena was prepared to acquire all outstanding Company shares for $6.25 per share in cash. Ascena sent a letter to the Board later that day confirming its interest in acquisition for $6.25 per share in cash.

51.     On March 13, 2012, Party D and Party E sent a letter to Barclays indicating their interest in acquiring, on a joint basis, all outstanding Company shares for a purchase price of $6.00 to $7.00 per share in cash.

52.     On March 30, 2012, Party F sent a letter to the Company indicating its interest in acquiring all outstanding Company shares for a purchase price of $6.20 to $6.50 per share in cash.

53.     On March 31, 2012, Party G sent a letter to the Company indicating its interest in acquiring all outstanding shares for a purchase price of $6.49 to $6.79 per share in cash. The letter stated that the proposal was not contingent upon the receipt of third-party debt financing.

54.     Although three bidders were indicating a willingness to pay more for the Company than Ascena, Charming Shoppes nonetheless fast-tracked negotiations with Ascena by meeting more often with Ascena than other bidders and by offering them the first chance to submit a draft merger agreement. For example, on April 6, 2012, Ascena sent a marked copy of

the Merger Agreement to Charming Shoppes. Party D and Party E did not submit their marked copy of the Merger Agreement to Charming Shoppes until April 20, 2012.

55. On April 12, 2012, at a meeting of the Board, defendant Goldstein, Chairman of the Board, disclosed to the Board that he was then a member of the senior advisory board of an entity that may be providing acquisition financing to one of the potential bidders, which was not Ascena. Although defendant Goldstein stated that he would recuse himself from any negotiations involving Charming Shoppes and such party or Board discussions or deliberations concerning such party he, remarkably, did not otherwise remove himself from the strategic process. Defendant Goldstein became a member of the global senior advisory board of Jefferies Group Inc. in April 2012.

56. On April 23, 2012, Ascena sent Charming Shoppes an updated offer of $6.50 per share. Later that day, in response to a request from Barclays, Party D and Party E sent a letter to Barclays containing an updated offer of $6.50 per share, payable in cash, to be financed through a combination of committed equity and debt financing.

57. On April 25, 2012, in response to a request from Barclays, Ascena indicated to Barclays that it would be willing to increase its offer above $6.50 but below $7.00 per share in cash. The same day, Parties D and E indicated to Barclays that they were prepared to raise their offer to $7.00 per share, conditioned upon an exclusivity arrangement and certain other terms and conditions.

58. On April 26, 2012, Ascena communicated through Barclays that it was prepared to raise its offer to $7.35 per share in cash, provided that Charming Shoppes would agree to negotiate exclusively with Ascena for a limited period of time. The same day, in response to a request from Barclays, Party D and Party E informed Barclays that they would be prepared to

consider raising their offer of $7.00 per Charming Shoppes share by a material amount, conditioned upon an exclusivity arrangement and expense reimbursement provisions if they were not ultimately the successful bidder at such higher amount in the process.

59.    Thereafter, on April 26, 2012, Charming Shoppes entered into an exclusivity agreement with Ascena.  After subsequent negotiations, the parties entered into the Merger Agreement on May 1, 2012, after the markets closed for the price of $7.35 per share in cash.

**The Company Agrees to the Proposed Transaction for Insufficient Consideration**

60.    Despite its promise and poise for growth, the Company agreed to enter into the Proposed Transaction. In a press release dated May 2, 2012, the Company announced that it had entered into a Merger Agreement with Ascena for approximately $890 million in cash.

61.    Given the Company's recent performance, future prospects, and restructuring plan, the consideration shareholders are to receive is inadequate.  Moreover, at least one Wall Street analyst issued a price target of $8 per share the day that the Proposed Transaction was announced.  In addition, the Proposed Transaction price is a paltry 25% premium over Charming Shoppes's closing stock price on May 1, 2012, the day before the Proposed Transaction was announced. Accordingly, Ascena is picking up Charming Shoppes at the most opportune time, at a time when Charming Shoppes is poised for growth and its stock price is trading at a huge discount to its intrinsic value.

62.    In fact, many analysts expressed that the price contained in the Merger Agreement is inadequate and undervalues the Company. Less than a month before the announcement of the Proposed Transaction, Morry Brown of CL King & Associates rated Charming Shoppes as a "strong buy" with a target price of $8.60 per share, which constitutes a 17% premium to the offer price.

14

63.     The same day as the announcement of the Proposed Transaction, Mike Richardson of Sidoti & Company LLC rated Charming Shoppes as a "neutral" with a price target of $8.00 per share, which also constitutes a premium to the offer price.

64.     On May 3, 2012, the Company filed the Merger Agreement with the SEC as an exhibit to a Form 8-K. As part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

**The Board Acquiesces to Preclusive Deal Protection Devices**

65.     By way of example, §6.04 of the Merger Agreement includes a "no solicitation" provision barring the Board and any Company personnel from attempting to procure a price in excess of the amount offered by Ascena. This section also demands that the Company terminate any and all prior or on-going discussions with other potential suitors. Despite the fact that they have locked up the Company and bound it to not solicit alternative bids, the Merger Agreement provides other ways that guarantee the only suitor will be Ascena.

66.     Pursuant to §6.04 of the Merger Agreement, should an unsolicited bidder make a superior proposal, the Company must notify Ascena of the bidder's offer. Thereafter, should the Board determine that the unsolicited offer is superior, Ascena is granted, pursuant to §6.04 of the Merger Agreement, four days as a "last look" to amend the terms of the Merger Agreement to make a counter-offer that only needs to be at least as favorable to the Company's shareholders as the unsolicited offer so that the alternative proposal is no longer considered a superior proposal. Ascena is able to match the unsolicited offer because it is granted unfettered access to the unsolicited offer, in its entirety, eliminating any leverage that the Company has in receiving the unsolicited offer. In other words, the Merger Agreement gives Ascena access to any rival

15

bidder's information and allows Ascena a free right to top any superior offer. Accordingly, no rival bidder is likely to emerge and act as a stalking horse for Ascena, because the Merger Agreement unfairly assures that any "auction" will favor Ascena and piggy-back upon the due diligence of the foreclosed second bidder.

67.     In addition, pursuant to §8.06 of the Merger Agreement, should another unsolicited bidder overcome the "last look," the Merger Agreement provides that a termination fee of $30 million must be paid to Ascena by Charming Shoppes if the Company decides to pursue the other offer before the consummation of the Proposed Transaction. This essentially requires that the alternate bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

68.     Finally, Ascena is also the beneficiary of a "Top-Up" provision that ensures that Ascena gains the shares necessary to effectuate a short-form merger. Pursuant to the Merger Agreement, if Ascena receives 80% of the shares outstanding through its tender offer, it can effect a short-form merger. In the event Ascena fails to acquire the 80% required, the Merger Agreement also contains a "Top-Up" provision that grants Ascena an option to purchase additional shares from the Company in order to reach the 80% threshold required to effectuate a short-form merger with the need for any further shareholder approval. The "Top-Up" provision essentially renders the tender offer *a fait accompli* and eliminates the possibility that any alternate bidder can mount a serious challenge to Ascena's position.

69.     Ultimately, the "no solicitation" clause and the "last look" provision coupled with the termination fee illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide

proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances. Likewise, these provisions, coupled with the "Top-Up" provision, also foreclose any likely alternate bidder from providing the needed market check of Ascena's inadequate offer price.

**The Board Is Conflicted**

70.    In addition, the inadequate offer price is the result of a failed strategic process where the Board failed to give adequate consideration to all strategic alternatives, including a divestiture of Fashion Bug.  By reason of their positions with Charming Shoppes, the Individual Defendants are in possession of non-public information concerning the financial condition and prospects of Charming Shoppes, and especially the true value and expected increased future value of Charming Shoppes and its assets, which they have not disclosed to Charming Shoppes's public shareholders. Moreover, the Defendants have clear and material conflicts of interest and are acting to better their own interests at the expense of Charming Shoppes's public shareholders. The Board members manipulated the strategic process by engineering a Proposed Transaction that is beneficial to themselves and other Company insiders at the expense of Charming Shoppes shareholders.

71.    Specifically, the Board agreed to the Proposed Transaction because they stand to gain a monetary windfall if the Proposed Transaction closes by virtue of the large amount of ownership of Company stock.  As of May 7, 2012, the directors and executive officers of Charming Shoppes beneficially owned, in the aggregate 883,792 shares of Company stock, including the settlement of restricted stock unit awards.  If the directors and executive officers were to tender all of these Company shares for purchase pursuant to the tender offer, then the

17

directors and executive officers would receive an aggregate of $6,495,871 in cash pursuant to tenders arising from the Proposed Transaction.

72.     In addition, defendant Romano is the beneficiary of both a lucrative severance agreement, should his employment with the Company be terminated under certain conditions, and a portion of the $6 million success and retention bonus pool funds.

73.     Based on the aforementioned, the Proposed Transaction is wrongful, unfair and harmful to Charming Shoppes's public shareholders, and represents an effort by Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of Company shareholders. The Proposed Transaction is an attempt to deny Plaintiffs and other shareholders their rights while usurping the same for the benefit of defendants on unfair terms.

## The Recommendation Statement Is Materially Misleading and Incomplete

74.     On May 15, 2012, the Company filed the Recommendation Statement with the SEC in connection with the Proposed Transaction. It is important that the Company make full and accurate disclosure of all relevant information so that shareholders can make an informed decision as to whether or not to tender their shares, especially in light of the faulty sale process described above.

75.     The Recommendation Statement fails to provide the Company's shareholders with material information and/or provides them with materially misleading information thereby rendering the shareholders unable to make an informed decision on whether to vote in favor of the Proposed Transaction.

76.     The Recommendation Statement states that, while the Board was conducting a sales process for the entire Company, the Board was also conducting a parallel sales process to attempt to sell its Fashion Bug business. The Recommendation Statement is materially deficient in describing this sales process. Specifically, the Recommendation Statement fails to disclose

18

the amount of any indications of interest offered by any potential bidders for the Fashion Bug business, including the parties referred to as "Party B" and "Party C." Without material information regarding the amount of interest that potential bidders were showing in the Fashion Bug business, Charming Shoppes shareholders are unable to weigh whether or not the Proposed Transaction is the most-value maximizing option for shareholders.

77. In addition, the Recommendation Statement indicates that, on April 28, 2012, Charming Shoppes "received notice that Party G would not move forward in pursing a negotiated transaction" with Charming Shoppes. However, the Recommendation Statement fails to disclose the reasons that Party G was not proceeding with the sales process, including whether the fact that the Company had already entered into exclusivity with Ascena was a contributing factor. This information is crucial for shareholders because Party G had offered a higher indication of interest than Ascena at an earlier stage in the strategic process. Accordingly, Charming Shoppes shareholders should be informed as to whether Party G withdrew from the strategic process due to the Company's favoritism towards Ascena.

78. The Recommendation Statement indicates that, on April 29, 2012, "the Board had been advised that Party F would need several additional weeks to finalize its offer." However, the Recommendation Statement fails to inform shareholders whether or not the Board felt that Party F would be likely to submit a bid in excess of the final offer price of $7.35 per share.

79. The Recommendation Statement indicates that, on April 26, 2012, "Party D and Party E informed Barclays that they would be prepared to consider raising their offer of $7.00 per Share by a material amount," but gives no indication what this material amount might be, including whether or not the "material amount" would be likely to be in excess of $7.35 per share.

19

80.   The Recommendation Statement also indicates that Barclays will be paid "approximately $10.8 million will be payable on completion of the Offer and the Merger." However, the Recommendation Statement does not disclose whether or not Barclays stood to receive a lesser contingency fee if the Company opted to divest the Fashion Bug business instead of agreeing to sell the entire Company.   This information in undoubtedly material for shareholders, as the Barclay's compensation structure may have biased Barclays towards favoring a sale of the entire Company over the divestiture.

81.   The Recommendation Statement fails to adequately disclose the underlying methodologies, projections, key inputs and multiples relied upon and observed by Barclays, the Company's financial advisor, so that shareholders can properly assess the credibility of the various analyses performed by Barclays and relied upon by the Board in recommending the Proposed Transaction.   In particular, the Recommendation Statement is deficient and should provide, *inter alia*, the following:

(i)    The complete set of financial projections and forecasts of the Company. While the Recommendation Statement discloses the Net Sales, EBITDA, and Unlevered free cash flow estimates for years 2012-2016 that management provided to Barclays, the Recommendation Statement fails to disclose the estimates for Earnings Per Share for the years 2015 and 2016;

(ii)   For the allegedly comparable company listed in the *Analysis of Selected Public Companies*, the ratio of the current stock price to the company's projected earnings per share, and each company's enterprise value to its historical and projected earnings before interest, taxes, depreciation and amortization, adjusted for the impact of any non-recurring items, as calculated and analyzed by Barclays;

(iii)  The multiples observed for each company in the *Analysis of Selected Precedent Transactions*;

(iv)   The criteria utilized by Barclays to select the transactions observed in the *Analysis of Selected Precedent Transactions*; and

(v)    The criteria for selecting terminal value multiples of 5.0x to 7.0x as well as discount rates ranging from 14% to 16% in its *Discounted Cash Flow Analysis*.   The analysis

also fails to define "estimated weighted average cost of capital" or "estimated unlevered free cash flows" as used in the *Discounted Cash Flow Analysis*.

82.     Further, the Recommendation Statement omits material information regarding the financial advisor retained in connection with the Proposed Transaction. Specifically, the Recommendation Statement states that Barclays was retained as the Company's financial advisor in the Proposed Transaction but fails to inform the shareholders the (i) criteria used for selecting Barclays, and (ii) the services that Barclays has provided and/or is currently providing to Charming Shoppes, Ascena, or any other entity involved in the sales process that it has received compensation for, and the amount of such compensation. It is material for shareholders to be informed as to why the Board selected Barclays as well as any other financial and economic interests Barclays or its clients have in the Proposed Transaction or in the parties involved that could be perceived or create a conflict of interest.

83.     The Recommendation Statement further neglects to provide shareholders with sufficient information to evaluate the pros and cons associated with the other strategic alternatives considered by the Board. The Recommendation Statement states that the Board considered "continued adherence to its existing restructuring plans" and well as a potential sale of its Fashion Bug business.   The Recommendation Statement should disclose all strategic alternatives that were discussed, the steps undertaken to pursue such alternatives, and the reasons the Board ultimately determined that the sale of the Company to Ascena was the best alternative.

84.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

21

## CLAIMS FOR RELIEF

### COUNT I
### INDIVIDUAL CLAIM FOR VIOLATIONS
### OF SECTION 14(E) OF THE 1934 ACT
### (Against All Defendants)

85.     Plaintiff repeats all previous allegations as if set forth in full herein.

86.     Defendants violated Section 14(e) of the 1934 Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or engaged in deceptive or manipulative acts or practices, in connection with the tender offer commenced in conjunction with the Proposed Transaction.

87.     Defendants knew that Plaintiff would rely upon their statements in the Recommendation Statement in determining whether to tender its shares pursuant to the tender offer commenced in conjunction with the Proposed Transaction.

88.     As a direct and proximate result of these Defendants' unlawful course of conduct in violation of Section 14(e) of the 1934 Act, absent injunctive relief from the Court, Plaintiff has sustained and will continue to sustain irreparable injury by being denied the opportunity to make an informed decision in deciding whether or not to tender her shares.

### COUNT II
### CLASS CLAIM TO ENJOIN THE PROPOSED TRANSACTION FOR
### FUNDAMENTAL UNFAIRNESS UNDER 15 PA.C.S. § 1105
### (Against all Defendants)

89.     Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

90.     Pursuant to 15 Pa.C.S. § 1105, shareholders in a Pennsylvania corporation are entitled to an injunction against a shareholder vote if fundamental unfairness is present.

91. In agreeing to the Proposed Transaction, the Individual Defendants favored Ascena as well as their personal interests during the sale process, resulting in the fundamentally unfair terms of the Proposed Transaction.

92. As set forth above, the Proposed Transaction is fundamentally unfair to Charming Shoppe's legitimate shareholders with respect to: the way in which the Proposed Transaction was structured, negotiated, and disclosed to Charming Shoppe shareholders and the economic and financial considerations and consequences of the Proposed Transaction. This Court therefore has the authority under Pennsylvania statute and common law to enjoin the Proposed Transaction.

93. By reason of the foregoing, Plaintiff and each member of the Class are suffering irreparable injury, including injury for which there is no adequate remedy at law.

### JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants jointly and severally, as follows:

(A) declaring that this action is properly maintainable as a class action as to the supplemental Pennsylvania law claims, and that Plaintiff is a proper class representative;

(B) enjoining, preliminarily and permanently, the Proposed Transaction;

(C) enjoining defendants, their agents, counsel, employees and all person acting in concert with them from consummating the Proposed Transaction unless and until the Company amends the Recommendation Statement so that it no longer omits material information concerning, among other things, the Proposed Transaction;

(D) in the event that the Proposed Transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff rescissory damages;

(E) awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(F) granting Plaintiff such further relief as the Court deems just and proper

DATE:  May 23, 2012

**TRUJILLO RODRIGUEZ & RICHARDS, LLC**

By: _Jennifer Agnew_

Kenneth I. Trujillo (No. 46520)
Ira Neil Richards (No. 50879)
Jennifer Agnew (No. 206673)
1717 Arch Street, Suite 3838
Philadelphia, PA  19103
Phone: (215) 731-9004
Fax:  (215) 731-9044
irichards@trrlaw.com
ktrujillo@trrlaw.com
jagnew@trrlaw.com

**OF COUNSEL:**

**POMERANTZ HAUDEK GROSSMAN & GROSS LLP**

Gustavo F. Bruckner
Samuel J. Adams
100 Park Avenue
New York, NY 10017
(212) 661-1100